E. I. Du Pont De Nemours & Company

*v.*

Owen L. Kessler.

(*Nashville,* December Term, 1960.)

Opinion filed April 5, 1961.

Charles L. Cornelius, Nashville, W. B. De Riemer, Wilmington, Del., for plaintiff in error.

Cecil D. Branstetter, George E. Barrett, Ben F. Loeb, Jr., Nashville, for defendant in error.

Mr. Justice Tomlinson delivered the opinion of the Court.

The only question in this Workmen's Compensation Case wherein Kessler was awarded compensation based on permanent total disability is whether this disability arose out of, and in the course of, his employment by plaintiff-in-error, Du Pont De Nemours. He had been employed as a welder by Du Pont for about a year and a half before he had on August 27, 1959 the attack upon which his claim in this case is based.

What Kessler did at Du Pont was welding and iron work, including the making of bar joints, lintels and gradings. His work necessitated burning, welding and grinding on galvanized parts. Welding creates noxious fumes. The welders were, therefore, required to wear a hood over their heads.

On the occasion of this attack which rendered him unconscious, Kessler and a fellow workman were making curb angles out of angle iron. Some of the angle iron weighed as much as 200 pounds. They were lifted to a big iron table where through a described process they were cut with torches into clips. Kessler had completed the welding on one side on an iron weighing 100 pounds. In order to commence welding on the other side, Kessler picked up the angle iron upon which he was working for the purpose of turning it around.

Then it was, as Kessler describes it, "my heart just got to paining and I don't know what I did. I just fell out". His condition at that minute is described as a "blackout". He describes the attack as being "just ter-

rible pain in there'', meaning near the heart which he
says ''revved (sic) up and got awful fact''. He regained
consciousness at the office of Dr. Forman in Nashville
some ten miles from the scene of the attack.

Dr. Forman at once sent Kessler to the Veterans Hos-
pital. What then happened in the language of Kessler
is this:

''A. Well, when I first got there, I wasn't able to
take the operation. So, they kept me there, oh, a month,
I guess. They couldn't get me checked. So, they finally
did get me in the shape they wanted me. Took me
down to about one hundred and twenty pounds and
that way they said they would make this operation
without any pressure or water in your body much
easier. And they did that and then they gave it to me.''

The operating doctors told Kessler that the operation
had not been a success. He was sent home one month
later.

Kessler then return to Du Pont. It declined to re-
employ him because of his heart ailment. His efforts to
obtain or retain employment requiring an appreciable
amount of exertion at other places were for the same
reason unsuccessful.

Nine months later, he returned to the hospital for the
purpose of continuing the operation which had been de-
scribed as incomplete. He was discharged in two weeks
because one of the necessary doctors was absent. ''Said
they would call me back again''. But his heart began to
beat very fast, etc. Hence, he returned before being
called and remained there ''nearly a month'', then dis-
charged. Presumably, the operation was never com-
pleted.

Kessler was discharged from the navy after three months service because of the condition of his heart. It does not appear, however, that this condition interfered with his ability to do physical labor requiring ordinary but appreciable exertion prior to this attack for which he is seeking compensation from Du Pont.

The remainder of the evidence at all material to the decision of the single issue in this case is that furnished by Dr. Massey. He is a specialist in internal medicine and heart ailments. He was called as a witness by Kessler. His examination of Kessler was some week or so before the trial.

Dr. Massey, after taking the complete physical history of Kessler, including the history of the aforementioned surgery, made an all inclusive physical examination. A casual watching of Kessler as he walked around in the office, and in removing his clothes, and in getting upon the examination table made it obvious to Massey that Kessler was "limited so far as activity was concerned" and the exertions mentioned in preparation for the examination "caused some shortness of breath".

A part of Kessler's history, as given by him to Dr. Massey, was that he had suffered an attack of rheumatic fever when he was ten years old, and a second attack at age of fifteen. Rheumatic fever causes an affliction of the heart known as "mitral stenosis". Mitral stenosis is caused only by rheumatic fever. Neither exertion nor obnoxious fumes will cause it. This disease, mitral stenosis, does not come on rapidly after the rheumatic fever attacks, nor progress rapidly. But it is a progressive disease. Kessler was forty-six years of age when he had the attack upon which this suit is based. It was his first.

The "mitral valve is one of the four heart valves". "Stenosis means a stricture or closure or an inability to open". This inability to open the mitral valve is the disease known as mitral stenosis, it being the heart disease from which Kessler is suffering.

Mitral stenosis limits the amount of blood which can go through the heart, because the mitral valve does not open. This limits the amount of exertion of which a person suffering from that disease is capable. Any exertion above that limit causes "a demand for more blood and a person with mitral stenosis cannot respond to this demand". When the heart attempts to force more flow through in keeping with the excess exertion there is a backing up of fluid in the lungs. This is known as "pulmonary edema". Dr. Massey states that "this, by history, is the type of attack that Mr. Kessler had when he blacked-out". He says that "fainting is not an infrequent occurrence."

Kessler's attack was the result of the fact that at the time of the attack the disease had progressed to the point that the exertion necessary to the performance of his duties at Du Pont was an exertion beyond the limits of the exertion of which he had then become capable; hence, the attack of "pulmonary edema".

The operation at the hospital was for the purpose of opening the mitral valve so that more blood could get through. But the operation did not accomplish its purpose in that it did not open this valve. To use the doctor's language,

"the operation is designed, of course, to open the valve, and, therefore, to increase his ability to get blood through. It was not opened and, therefore, he had

no evidence of any, certainly no possibility of improvement. And as a matter of fact, he did more poorly after the surgery."

He testified that "the opening would not permit the tip of the little finger to slide through", whereas, normally the opening would "take two fingers quite comfortably".

On direct-examination the duties of Kessler's employment with Du Pont were stated to Dr. Massey. The physical requirements incident thereto were related. The obnoxious fumes were stated. There then followed these questions and answers:

"Q. Then, the question that I asked you, Doctor, the hypothetical question that I asked you, would this activity that we described to this forty-six year old male, in your opinion, aggravate or contribute to the heart condition of this man as to be likely to initiate, aggravate, or contribute to a heart attack, resulting in permanent disability? A. The exertion so far as this is concerned, we are on very firm ground that this could either initiate or could aggravate or complicate his picture considerably.

"Q. And, so you would answer that question certainly as to lifting? A. Yes sir. As to exertion."

The doctor said that he was not so certain as to the effect of the fumes, but that it "also could probably cause aggravation of his complaints". At that point the record discloses the following:

"By the Court:

"Q. I undersood your last statement, Doctor, to be somewhat a summary to the effect that exertion does

cause an aggravation of the disability or the trouble that you found Mr. Kessler to suffer? A. Yes, sir.''

Thereupon Dr. Massey was taken over by the defendant, Du Pont, for cross-examination. The following questions and answers were had:

"Q. Now, then, as I understand you, this edema of the lungs can be caused by over exertion? A. Yes.

\* \* \* \* \* \*

"Q. Now, then, the edema that you speak of, it is only temporary, isn't it? A. Given prompt and very excellent medical care, it is usually reversible and the individual is left in usually essentially the same state as before the edema.

"Q. Now, then, if Mr. Kessler went to the Veterans Hospital and I believe he entered the Veterans Hospital the same day, August 27, 1959, and received expert treatment, how many days do you think it would be before there would be a reversal of this edema and he would be restored to the same condition that had existed prior to his blackout on August 27, 1959? A. In general, the edema is reversible in a matter of hours.

\* \* \* \* \* \*

"Q. (By Mr. Cornelius) Now, you don't know, of course, just what those gentlemen found with reference to Mr. Kessler's condition, but taking the hypothetical question that Mr. Branstetter put to you, where Mr. Kessler blacked out, and was suffering from edema of his lungs and having medical care that has been suggested by the names of these doctors to you, all of whom you know, you would say that Mr. Kessler should have recovered from the edema of his lungs in a matter

of hours? Is that correct? Answer Doctor? A. He should have recovered from edema of his lungs but the problem then is that the underlying disease had been discovered which is a progressive ailment, and from there on it was a matter of the treatment of his mitral stenosis.

"Q. And as I understood you to say, mitral stenosis is caused only so far as medical science knows by rheumatic fever? A. Yes, sir."

The doctor testified that Kessler's mitral stenosis was not worse after the operation, "but he did not do as well afterwards".

"Q. Due to the operation? A. Or to the progressiveness of his disease or to the fact that he was older and his heart muscle was not as strong for that age. He was not as well."

The doctor closes his testimony with the following statement:

"Pulmonary edema is not infrequent. But, after the first attack of mitral stenosis, very often the patient does not regain his full ability to work as well as he had done before. But, subsequent attacks are responded and they go back pretty well to their stable position. In the first attack, often times they do not go back to work. Oftentimes, if they are pregnant and have this attack, from then on they are limited. But men pretty well have their attacks and regain their stable condition. In other words, if they are able to walk up ten steps, then the next time they have an attack of pulmonary edema, they can go up ten steps."

It is clear from Dr. Massey's testimony that his blackout was due to the exertion which he was undergoing in the performance of his duties. This blackout was because of his subsequently discovered heart ailment, mitral stenosis, a progressive disease. That disease was not caused by his work. That disease had progressed to the point that the exertion caused the edema of the lungs by which he was rendered unconscious.

According to the testimony of Dr. Massey, this edema "is usually reversible and the individual is left in usually essentially the same state as before the edema". And "in general the edema is reversible in a matter of hours". But, says Dr. Massey in Kessler's treatment at the Veterans' Hospital "the underlying disease (mitral stenosis) had been discovered and is a progressive ailment, and from there on it was a matter of the treatment of his mitral stenosis".

The duties of Kessler and the exertion thereby caused had nothing whatever to do with the possession by Kessler of his mitral stenosis. But in the treatment of this mitral stenosis, which had been discovered, it was deemed proper by the experts at the hospital, says Dr. Massey, to perform the heart operation stated. The operation was not made necessary by reason of the exertion incident to the duties of Kessler at the time of his attack of "edema". It was done to correct or improve Kessler's mitral stenosis ailment, an ailment entirely disconnected with his duties at Du Pont or the exertion thereby caused. So far as the edema was concerned, usually it "is reversible in a matter of hours", and leaves the person in "essentially the same state as before the edema". There is no evidence in this case that this edema was any different in its result from that usually occurring.

The aforesaid operation performed for the purpose of aiding or correcting an ailment with which the performance of the duties with Du Pont were entirely disconnected was a failure ''and as a matter of fact he did more poorly after the surgery'', says Dr. Massey.

As this Court views it, the only conclusion permissible from Dr. Massey's testimony is that (1) except for the operation Kessler would have entirely recovered from the attack of edema ''in a matter of hours'', and Kessler would have been left ''in usually essentially the same state as before the edema''; and (2) the unsuccessful operation was not performed because of the attack of edema. It was performed for correcting a heart condition entirely unconnected with the performance by Kessler of his duties at Du Pont.

For the reasons stated, this Court can reach no other conclusion than that there is no evidence of any causal connection between Kessler's employment and the condition which rendered him permanently and totally disabled.

The judgment of the Circuit Court will be reversed and the petition for compensation denied.